# PEOPLE OF PORTO RICO, Plff.,

## *v.*

# MATEO FAJARDO CARDONA, Dft.

San Juan, Law, Nos. 1001, 1002, 1003.

REMOVAL OF CRIMINAL CAUSE UNDER REVISED STATUTES, SECTION 641.

Constitution.

    1. The 6th Amendment of the Constitution runs against the Federal government and not against the states.

Constitution.

    2. It seems that by the 6th Amendment of the Constitution the Federal government is denied the right to change the venue in a criminal case.

Removal of Causes.

    3. By § 171 of the Code of Criminal Procedure of Porto Rico, a criminal case may be removed either by the government or by the defendant.

Removal of Causes.

    4. The fact that inconvenience would result in the trial of a case removed from a local court to the Federal court by virtue of § 641 of the Revised Statutes of the United States is not controlling.

Constitution.

    5. The Constitution is applied to the people of new territory by act of Congress and not by treaty, and this application can be made either in whole or in part.

The Federal Court.

    6. The Federal court in Porto Rico is for some purposes required to treat the laws of Porto Rico as other district courts treat the laws of the individual states, but this does not mean that it is to treat the laws of Porto Rico as the laws of a state; it must approach the laws of Porto Rico as the laws of a territory.

Constitution.

    7. Amendments 4 and 5 of the Constitution are applied to Porto Rico by virtue of the Foraker or Organic Act.

People v. Cardona.

Interpretation of Statutes.

8. The occasion of the enactment of a law is not controlling, as its phraseology may be broader than the particular condition sought to be covered, but the occasion for the enactment often throws light upon its meaning.

Civil Rights Law.

9. Sections 641 and 642 of the Revised Statutes of the United States are not applicable to cases involving wrongful procedure by local officials; they cover only cases where Federal rights are denied by legislation.

Civil Rights Law.

10. The removal of a criminal case by virtue of a local law from one district to another is not a denial of an equal civil right.

Opinion filed November 30, 1915.

_____

## Statement of Facts.

The petition in this case, filed October 25, 1915, shows that the defendant is charged with having committed the offense of bribery in three instances, all in the district and municipality of Mayaguez, Porto Rico. It claims that a right to a jury trial in the district in which the offense is alleged to have been committed has been denied by the highest court in Porto Rico, and the said causes transferred to Aguadilla, thence to San Juan, and thence returned under certiorari from the local supreme court to the district of Aguadilla. The alleged grounds for removal were affidavits that in the opinion of affiants a fair trial could not be had in Mayaguez. The petition prays that the papers be filed in the Federal court, and the case tried there. Proper bond and other papers were filed with the Federal court, the local court not having complied with the petition

People v. Cardona.

of the defendant for removal. The case was docketed in the Federal court on October 25, 1915, and on the same day the People of Porto Rico appeared and prayed that the order of removal and docketing be set aside, and that the case be left in the district court of Aguadilla for proper proceedings in accordance with law.

The matter came up upon these cross motions, and was fully argued by counsel.

*Mr. Willis Sweet* for petitioner to remove.

*Mr. R. W. Perkins, Jr.,* acting Attorney General, for the People of Porto Rico.

HAMILTON, Judge, delivered the following opinion:

By his petition filed in this court October 25, 1915, which is the basis of the proceedings in this court, Mateo Fajardo Cardona alleges that he is deprived of the civil rights guaranteed him by the 6th Amendment of the Constitution, which reads as follows: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

The alleged violation is on the part of the People of Porto Rico, in securing through their attorney general a change of

venue in three criminal cases against the defendant, from the Mayaguez district court, in which district defendant lives and where the crime is alleged to have been committed, to the Aguadilla district court, all against the defendant's protest. The law under which the Federal court is asked to intervene is that contained in United States Revised Statutes, § 641.

1. It is not contended on behalf of petitioner that any right is violated which is dependent upon the 14th Amendment as to due process of law. Frank v. Mangum, 237 U. S. 309, 59 L. ed. 969, 35 Sup. Ct. Rep. 582. If it did, the procedure would perhaps be by habeas corpus after conviction. This eliminates from consideration a good deal that was argued by counsel. The case turns solely upon the applicability of the 6th Amendment. This requires due process of law, indeed, defines it in Federal procedure. But the 6th Amendment, like others in this Bill of Rights, runs against the Federal government, and not against the states. Therein is its difference from the 14th Amendment, which in many respects changed the entire relation of the Federal government and the states. It is conceded that the Federal government itself has never passed a statute authorizing its prosecuting officers to secure a change of venue on account of difficulty in securing a fair trial at any particular place. It is contended, however, that this happens to grow out of the fact that the Federal districts are large, and suitable jurymen can therefore be secured from a distance, if necessary. It is argued that by the common law, which came to America with the colonies, there was such a right on the part of the government to a change of venue. Rex v. Nottingham, 4 East, 208, 1 Smith, 31 (1803.) The court recites in that case that the court had originally the right of directing an indictment

to be tried in the next adjoining county in cases where justice required it. Even if this authority were applicable, however, the 6th Amendment took away whatever right of this kind there was in the government. The Federal government does not seem to have the right to change the venue in a criminal case.

2. Porto Rico originally did not have a jury system in either civil or criminal cases, and up to the present time Porto Ricans do not, except in the Federal court, enjoy the right of a jury trial in civil cases. A civil government under the present Organic Act went into effect May 1, 1900, and the next year, on January 12, 1901 (P. R. Rev. Stat. § 1119), a jury trial was provided for, when demanded, in cases where the punishment was imprisonment for two years or more, that is to say, in what are ordinarily known as felonies. P. R. Penal Code, §§ 14 and 16; P. R. Rev. Stat. §§ 5420–5422. Other provisions were enacted in the Code of Criminal Procedure in 1902. P. R. Code Crim. Proc. § 178. Under this the defendant was allowed a change of venue where injustice might be done him in the place of his residence.

The statute now in question was enacted afterwards. By this a right to change of venue was extended to the prosecution (Act of March 10, 1904, p. 61). This double right of removal is in the Code of Criminal Procedure, of which § 171 is as follows:

A criminal case may be removed by a district court, in which it is pending, on the application of the prosecuting attorney or of the defendant:

First. On the ground that a fair and impartial trial cannot be had in the district where said case is pending, or when by

reason of public disorder existing in said district a fair and impartial trial as between the accused and the government cannot be safely and speedily had, or whenever the life of the accused or of any of the witnesses should be jeopardized by a trial in that district.

Second. On the ground that no jury can be obtained for the trial of the case in such district.

For the same reasons a criminal case may be transferred to a municipal court.

The supreme court of Porto Rico has in effect declared the removal law to be effective. In this very case of Fajardo v. Nussa, July 28, 1915, it remanded the trial of this case from San Juan to Aguadilla, and thus lets it remain for trial at Aguadilla.

Porto Rico, therefore, has by legislation authorized the procedure carried out in this case by its officers, and sanctioned by its supreme court, all against petitioner's objection. Does this violate an equal civil right declared in Rev. Stat. § 641? Is a jury of the vicinage such a Federal right?

3. An argument is drawn from inconvenience, in that, if the case at bar is tried in the Federal court, it will involve the trial of a local crime and there will be no provision for prosecution by any official. The law, however, is otherwise. A change of tribunal, and not a change of prosecuting officers, is contemplated by this section, and an indictment removed into the circuit court must be prosecuted by a representative of the state. The attorney general of Porto Rico would have the same right of prosecution in this court in the case of such removal as he would have in the local court. The whole case would be removed, with its plaintiff, prosecuting officer, and defendant.

People v. Cardona.

The only change would be in the officers of the court trying the case. Delaware v. Emerson, 8 Fed. 411. The law of the state defining the offense charged will be followed on the trial of an action removed into the Federal court. North Carolina v. Gosnell, 74 Fed. 734. See also Richter v. Magone, 47 Fed. 194, opinion by Circuit Judge Lacombe. It has also been suggested on the argument that such a decision would have the effect of paralyzing the administration of local criminal law, and that many cases will be transferred from the local courts to the Federal court. Even if true, this, of course, would not be controlling. The argument from inconvenience is unsafe. See Hawaii v. Mankichi, 190 U. S. 223, 248, 47 L. ed. 1025, 1034, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465. The fact that there were many cases which should be removed under Revised Statutes of the United States, § 641, would not be an argument against the application of that section. In point of fact, however, there is no reason to suppose that this result would follow. In all cases where there has been conviction the right could not now be set up. Section 641 itself provides that the right must be claimed in the early progress of the case. The principal result would be that the local prosecuting officers would hereafter refrain from seeking a change of venue in criminal cases, and thus violating a constitutional right of defendants.

4. There are practically two answers made to the merits of the petition by the answer or motion of the People of Porto Rico. One is that Porto Rico is for jury matters invested with state powers, and the other is that Rev. Stat. § 641, invoked by petitioner, does not apply to the facts of this case.

What, then, are the political powers of Porto Rico?

People v. Cardona.

The acquisition of territory beyond the four seas, so to speak, raised the difficult question of the relation of the people in such acquisitions to the citizens of the United States. This became especially acute because of their being to a large extent of alien races and alien civilizations. There were judges who held that the acquisition of territory by treaty made the inhabitants Americans, and others that such acquisition made the territory American but did not make the people Americans. In the Insular Cases the opinion by Justice White suggested a view which finally prevailed as the opinion in later cases. This suggested a double distinction. In the first place, if the territory acquired was unorganized, the people had none except personal rights under the Constitution, that is to say, rights of life, liberty, and property. On the other hand, if it had an organized government, civil rights were affected by the acquisition, where such people had, by some distinct action of Congress, been incorporated with the United States. In other words, that not a treaty but an act of Congress applied the Constitution to the people of the new territory, and that this application could be made either in whole or in part. Downes v. Bidwell, 182 U. S. 244, 45 L. ed. 1088, 21 Sup. Ct. Rep. 770; Hawaii v. Mankichi, 190 U. S. 197, 47 L. ed. 1016, 23 Sup. Ct. Rep. 787, 12 Am. Crim. Rep. 465.

The distinction as to unorganized territory · is seldom applicable. It would apply to the North Pole, which Peary claimed to turn over to President Taft as part of the United States; but it will be very seldom that there is territory so sparsely settled as not to have an organized government. The distinction as to incorporation with the United States, however, is a vital one. It was held in the Mankichi Case, against

strong protest, that territory which is annexed does not neces-
sarily come under the full sway of the Constitution; that the
Constitution does not apply until made applicable · by act of
Congress. · It certainly does become applicable where act of
Congress incorporates the territory as a part of the United
States, as was done by the Organic Act of April 30, 1900, for
Hawaii. What was done in the interval between the Newlands
resolution of annexation and the Organic Act was the subject
of discussion in the Mankichi Case; and it was held that, while
fundamental personal rights applied, these did not include the
right of presentment by a grand jury and the right of a unani-
mous verdict by the historical jury of twelve men. There is
no question that "as the guaranty of a trial by jury, in the
3d article, implied a trial in that mode and according to the
settled rules of the common law, the enumeration in the 6th
Amendment of the rights of the accused in criminal prosecu-
tions is to be taken as a declaration of what those rules were,
and is to be referred to the anxiety of the people of the states
to have in the supreme law of the land, and so far as the agencies
of the general government were concerned, a full and distinct
recognition of those rules, as involving the fundamental rights
of life, liberty, and property." Callan v. Wilson, 127 U. S.
540, 549, 32 L. ed. 223, 226, 8 Sup. Ct. Rep. 1301. But
this is not to be held to apply until the formal incorporation
of the territory with the United States.

5. It is argued that Porto Rico is by the Foraker Act, § 34,
likened to a state so far as its laws are concerned, and United
States v. Cerecedo, 6 Porto Rico Fed. Rep. 607 and 615, and
Gromer v. Standard Dredging Co. 224 U. S. 370, 56 L. ed.
805, 32 Sup. Ct. Rep. 499, are cited as showing that Porto

Rico is to be regarded as a dependent, autonomous state, and not as technical territory. A further proof of this is also sought in the Rosaly Case, 227 U. S. 270, 57 L. ed. 507, 33 Sup. Ct. Rep. 352, where the people of Porto Rico are declared to be exempt from suit on quasi sovereign grounds. A state can change or even abolish the jury system. Frank v. Mangum, 237 U. S. 309, 342, 343, 59 L. ed. 969, 986, 987, 35 Sup. Ct. Rep. 582.

The question, therefore, is the relation of the Porto Rican government to the United States. As to this there can be no doubt. The United States, being a sovereign nation, can, so far as concerns foreign governments, acquire and hold territory in any way it sees proper. Downes v. Bidwell, 182 U. S. 244, 45 L. ed. 1088, 21 Sup. Ct. Rep. 770. This country can do whatever any country can do. It is, in its foreign relations, sovereign in every sense of the word. It is, however, within its own bounds, divided into the Federal government on the one side and a number of constituent states on the other, and has ever since 1787 held territory which it has "regulated" in such manner as it saw proper. Constitution, art. IV., § 3: ". . . The Congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state."

"Regulate" here means by means of laws, that is to say, is the same as legislation. Dorr v. United States, 195 U. S. 138, 144, 49 L. ed. 128, 130, 24 Sup. Ct. Rep. 808, 1 Ann. Cas. 697. It happened that this original territory was within the bounds of the United States recognized by the Treaty of Inde-

pendence of 1782, and from the beginning provision was made for creating new states therefrom. Under this a system of what came to be known as territories grew up, whose general features are found in United States Revised Statutes, §§ 1839–1895, Comp. Stat. 1913, §§ 3425–3527, and to which the Constitution applies by Rev. Stat. § 1891.

With the purchase of Alaska in 1867, and especially with the acquisition of the Hawaiian Republic (late Kingdom) in 1897, and of the Philippines and Porto Rico from Spain by the Treaty of 1898, a new system was entered upon. The territory thus acquired is not contiguous to the old states, and has required special rules not applicable to the original territories as such, but there seems to be no reason why the United States should not make new regulations if it sees proper. It is, indeed, the part of the sovereign power to make laws differing in detail, so as to suit the varying circumstances of different conditions as they arise. The country acquired as above is all territory of the United States, and governed by territorial laws prescribed by the United States. Being far separated and in different climates, no uniform territorial plan has been prescribed, and possibly none can be prescribed. The rules are different in each case.

Alaska originally had no legislature, and Congress adopted a series of codes and laws for all purposes there. Hawaii was originally an independent kingdom and much of its legislation was retained upon the acquisition of that country. The Philippines at first had a military government, which, however, as all military governments, recognized local civil laws, as modified by the Federal authority from time to time. Porto Rico at first was under military rule and the old Spanish laws were

enforced. In 1900, however, a civil government was established for Porto Rico with limited legislative powers, and there have been many changes made, especially with the adoption of the codes of procedure in 1902. In 1904 the Spanish Civil Code, in force for many years, was revised.

The same principle, however, applies. Porto Rico is to-day, as fully as when it was acquired by the Treaty of Paris, territory of the United States,—although Congress in its wisdom has seen fit not to use of it the word "Territory," as it did about the same time for Hawaii, and to govern it, not by the old territorial form of government throughout, with one system of courts to take care of both Federal and local business, but with a Federal court on the one side, looking after Federal jurisdiction precisely as in the states, and on the other a local government and local courts looking after local matters, much as in the states. In § 17 of the Organic Act, however, it is expressly made like a territory. The local government, no matter how autonomous in form, is not a state government in any sense of the word, and is simply a means by which Congress governs Porto Rico.

The Federal court in Porto Rico is vested with the same and as to persons with even greater jurisdiction than the other district courts in the United States, and for some purposes it is required to treat the laws of Porto Rico as other district courts treat the laws of the individual states. This does not, in any sense of the word, mean that this court shall treat the laws of Porto Rico as the laws of a state. It must approach the laws of Porto Rico as those of a territory.

6. The doctrine of incorporation of territory may be stated as follows: If a territory has been incorporated into the Union

People v. Cardona.

by definite act of Congress, its people become subject to the Constitution in all respects, and have all the rights which are guaranteed by that instrument so far as applicable to people under a territorial form of government. Rasmussen v. United States, 197 U. S. 516, 523, 529, 49 L. ed. 862, 864, 867, 25 Sup. Ct. Rep. 514 (Alaska). On the other hand, nonincorporation of an organized territory does not necessarily put its inhabitants outside the pale of the Constitution. The Constitution does not *ipso facto* apply to them, except as to certain personal rights, which, for example, do not include jury trial. But, nevertheless, when Congress legislates for this territory and its people, it may, and frequently does, extend certain provisions of the Constitution thereto. Ocampo v. United States, 234 U. S. 91, 98, 58 L. ed. 1231, 1234, 34 Sup. Ct. Rep. 712 (Philippines). This is a matter within the discretion of Congress, but when the discretion is exercised the constitutional rights are complete so far as they go.

If the question arises whether Porto Rico has been so incorporated into the Union, the answer, as above, must be that it has not been fully incorporated. Whether there can be a partial incorporation may be an open question. Practically it is not important. A partial incorporation would have few effects, so far as constitutional rights are concerned, except to extend the constitution *pro tanto,* and this would amount to very much the same thing as Congress extending these specific rights by legislation to an organized but unincorporated territory. Which view should be taken of Porto Rico it is unnecessary to decide. It has been held in this court in the Cerecedo Case that Amendments 4 and 5 of the Constitution apply to Porto Rico under and by virtue of the Foraker or Organic Act.

VIII. Porto Rico—19.

People v. Cardona.

This is unquestionably so as to all proceedings in the Federal court, and no reason is perceived why the same should not be true of other rights in what is called the Bill of Rights. The recent enactment of the law making Porto Rico an integral member of the first judicial circuit, in its terms placing it upon an equality with Maine, Massachusetts, and the other districts, at least confirms this view. The court of appeals of the first circuit, it is to be noted also, has this jurisdiction not only over the Federal district court for Porto Rico, but by appeal also over the supreme court of Porto Rico. Whether this amounts to an incorporation of Porto Rico with the Union for all judicial purposes is a question unnecessary to be decided in this case. The right now set up does not originate in the Federal court or Federal procedure *per se,* but in the local courts of Porto Rico, and the principal point to be determined is whether the district court of the United States can consider the alleged right arising in the local court in the form in which it is at present presented.

The point is the more important, because the establishment of the Federal and local systems of courts in Hawaii, as well as in Porto Rico, seems to indicate that, on account of contact with new conditions and new civilizations in those places, the United States has found it necessary to create a new kind of territory from that of the past. Instead of there being one set of courts, as under the Revised Statutes, the new territories have local and Federal jurisdictions in separate tribunals, whose relations can be settled only gradually and by careful construction.

7. The second defense to the petition set up by the People of Porto Rico, therefore, is that whatever the powers of Porto

Rico on the subject, the statute invoked, Rev. Stat. § 641, is inapplicable to the circumstances of the case at bar. The Constitution of the United States governs every citizen within the territorial limits of the Union. It is equally binding upon a state, territory, or Federal official. It was found wise, however, to fix the ultimate interpretation of rights arising under the Constitution in the Federal courts, because there had to be some final arbiter. What provisions might have been adopted it is unnecessary to discuss; those actually adopted are that causes may be removed from local courts, including those of Porto Rico, to the Federal courts in certain cases prescribed by law. U. S. Rev. Stat. § 639. These relate principally to where the defendants are nonresidents and wish to avoid what they may deem to be prejudice in the local courts. There is also the provision invoked in the case at bar. U. S. Rev. Stat. § 641. This latter system originated at the close of the Civil War, when it was deemed proper, before and after the 14th Amendment, to secure to persons lately in servitude the right to transfer civil or criminal cases from the local to the Federal courts when the states were supposed to violate any of the equal civil rights provided by the Federal laws. The occasion of the enactment of a law is not controlling. Its phraseology may be broader than the particular condition sought to be covered, and in such case it will be so interpreted; but the occasion for the enactment of a law often throws light upon its meaning. Heydenfeldt v. Daney Gold & S. Min. Co. 93 U. S. 634, 638, 23 L. ed. 995, 996, 13 Mor. Min. Rep. 204; Church of Holy Trinity v. United States, 143 U. S. 457, 36 L. ed. 226, 12 Sup. Ct. Rep. 511. A question in the case at bar is, how far this act goes in providing for a removal? These

People v. Cardona.

are the only two laws on the subject of removal of causes from local to Federal courts. It must not be overlooked, however, that the Federal policy is not exhausted by these two removal laws. There are many rights arising under the Constitution of the United States which may be asserted in a local court, but the decision of the local court is not final. It is not part of the Federal system to encourage clashes between Federal and local courts. Within their sphere both are of equal usefulness, and, in fact, are co-ordinated into one grand judicial system. At the same time, the final decision of such Federal rights rests with the Supreme Court of the United States, by reason of the law authorizing a writ of error from that court in such cases to the highest trial court of the state, and thus removing the decision to the supreme Federal tribunal. Rev. Stat. § 709. Virginia v. Rives, 100 U. S. 313, 25 L. ed. 667, 3 Am. Crim. Rep. 524. It is clear that the ordinary removal law does not apply to the case at bar. The question is, does what may be called the civil rights removal act apply, or is the defendant relegated to making his defense in the local court, setting up there the Federal right which he deems violated, and, if this is denied below, having the right of appeal from the highest local court to the Supreme Court of the United States?

8. What may be called the equal civil rights removal act is contained in §§ 641 and 642 of the Revised Statutes of the United States, and read as follows:

"Sec. 641. When any civil suit or criminal prosecution is commenced in any state court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the state, or in the part of the state where such suit

People v. Cardona.

or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, or against any officer, civil or military, or other person, for any arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid, or for refusing to do any act on the ground that it would be inconsistent with such law, such suit or prosecution may, upon the petition of such defendant, filed in said state court at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed, for trial, into the next circuit court to be held in the district where it is pending. Upon the filing of such petition all further proceedings in the state courts shall cease, and shall not be resumed except as hereinafter provided. But all bail and other security given in such suit or prosecution shall continue in like force and effect as if the same had proceeded to final judgment and execution in the state court. It shall be the duty of the clerk of the state court to furnish such defendant, petitioning for a removal, copies of said process against him, and of all pleading, depositions, testimony, and other proceedings in the case. If such copies are filed by said petitioner in the circuit court on the first day of its session, the cause shall proceed therein in the same manner as if it had been brought there by original process; and if the said clerk refuses or neglects to furnish such copies, the petitioner may thereupon docket the case in the circuit court, and the said court shall then have jurisdiction therein, and may, upon proof of such refusal or neglect of said clerk, and upon reasonable notice to the plaintiff, require the

plaintiff to file a declaration, petition, or complaint in the cause; and, in case of his default, may order a nonsuit and dismiss the case at the costs of the plaintiff, and such dismissal shall be a bar to any further suit touching the matter in controversy. But if, without such refusal or neglect of said clerk to furnish such copies and proof thereof, the petitioner for removal fails to file copies in the circuit court as herein provided, a certificate, under the seal of the circuit court, stating such failure, shall be given, and upon the production thereof in said state court, the cause shall proceed therein as if no petition for a removal had been filed.

"Sec. 642. When all the acts necessary for the removal of any suit or prosecution, as provided in the preceding section, have been performed, and the defendant petitioning for such removal is in actual custody on process issued by said state court, it shall be the duty of the clerk of said circuit court to issue a writ of habeas corpus cum causa, and of the marshal, by virtue of said writ, to take the body of the defendant into his custody, to be dealt with in said circuit court according to law and the orders of said court, or, in vacation, of any judge thereof; and the marshal shall file with or deliver to the clerk of said state court a duplicate copy of said writ."

The decisions upon this law are uniform to the effect that even as to civil cases it is not applicable to wrongful procedure by a local official. The remedy for such administrative injuries is of another character. Rev. Stat. § 709. The statute quoted refers only to cases where Federal rights are denied by legislation.

The Supreme Court of the United States has declared this principle as follows: "The question as to the scope of § 641

People v. Cardona.

of the Revised Statutes again arose in the subsequent cases of Neal v. Delaware, 103 U. S. 370, 386, 26 L. ed. 567, 570; Bush v. Kentucky, 107 U. S. 110, 116, 27 L. ed. 354, 356, 1 Sup. Ct. Rep. 625; Gibson v. Mississippi, 162 U. S. 565, 581, 584, 40 L. ed. 1075, 1078, 1079, 16 Sup. Ct. Rep. 904, and Smith v. Mississippi, 162 U. S. 592, 600, 40 L. ed. 1082, 1085, 16 Sup. Ct. Rep. 900. In each of these cases it was distinctly adjudged, in harmony with previous cases, that the words of § 641, 'who is denied or cannot enforce in the judicial tribunals of the state, or in the part of the state where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States,' did not give the right of removal, unless the Constitution of the laws of the state in which the criminal prosecution was pending denied or prevented the enforcement in the judicial tribunals of such state of the equal rights of the accused as secured by any law of the United States. Those cases, as did the prior ones, expressly held that there was no right of removal under § 641, where the alleged discrimination against the accused, in respect of his equal rights, was due to the illegal or corrupt acts of administrative officers, unauthorized by the Constitution or laws of the state, as interpreted by its highest court. For wrongs of that character the remedy, it was held, is in the state court, and ultimately in the power of this court, upon writ of error, to protect any right secured or granted to an accused by the Constitution or laws of the United States, and which has been denied to him in the highest court of the state in which the decision in respect of that

right could be had." Kentucky v. Powers, 201 U. S. 1, 50 L. ed. 633, 26 Sup. Ct. Rep. 387, 5 Ann. Cas. 692 (1905).

9. The question arises, what are the rights covered by § 641? The section by its words applies where "any person is denied or cannot enforce in the judicial tribunals of the state, any right secured to him by any law providing for the equal civil rights of citizens of the United States." The definition of civil rights is not always clear. They do not cover social or domestic rights, such as marriage between persons of different races. Hoover v. State, 59 Ala. 57; Pace v. Alabama, 106 U. S. 583, 27 L. ed. 207, 1 Sup. Ct. Rep. 637; Ex parte Francois, 3 Woods, 367, Fed. Cas. No. 5,047. It does not apply where a law prescribes the jurisdiction of courts as to territorial limits or subject-matter of judgments. Missouri v. Lewis (Bowman v. Lewis) 101 U. S. 22, 25 L. ed. 989. Nor to the right to sell liquor. Bartemeyer v. Iowa, 18 Wall. 129, 21 L. ed. 929. Nor to Sunday laws. Frolickstein v. Mobile, 40 Ala. 725. Nor to police laws. Miller v. Texas, 153 U. S. 535, 38 L. ed. 812, 14 Sup. Ct. Rep. 874. Nor to separate quarters in public conveyances. Civil Rights Cases, 109 U. S. 3, 27 L. ed. 835, 3 Sup. Ct. Rep. 18. Nor to separate schools for different races. Bertonneau v. City Schools, 3 Woods, 177, Fed. Cas. No. 1,361. The law was designed primarily to assure all people, regardless of color or race, their rights of life, liberty, or property. It applies to an act of a state legislature giving a few persons the right to carry on stock yards near a large city, such as New Orleans. Slaughter-House Cases, 16 Wall. 36, 21 L. ed. 394. It has been frequently applied to juries, and forbids that juries be

composed exclusively of persons of one race. Neal v. Delaware, 103 U. S. 370, 26 L. ed. 567.

The above cases arose principally under the 14th Amendment, but it would be a strained construction which would confine the operation of § 641 to such cases. It would apply to Chinese if treated differently from other races. California v. Chue Fan, 42 Fed. 865. It applies to any right secured by law for equal civil rights, and the Constitution and its Amendments are as much laws as any statute passed by Congress. They are, in fact, the supreme law of the land.

This removal statute is limited to a denial of "the equal civil rights." Can it be said that the removal under local law of a criminal cause from the district in which it should be tried is a denial of an equal civil right provided by law? The defendant is treated precisely as all other defendants are treated. If there is a wrong, it is a wrong applicable equally to all. If there is no discrimination, Rev. Stat. § 641, does not apply. New Jersey v. Corrigan, 139 Fed. 761. The defendant may have a right to a trial by a jury of the vicinage, and its denial by statute may be wrongful. But in what respect is there any inequality, such as to call into effect the provisions of this statute? It is not alleged that the defendant is picked out for special maltreatment or wrongful execution of the law; under this statute only the law itself can be complained of, and that does not seem to deny any equality of treatment, such as is required by § 641. It is not every denial by a state enactment, of rights secured by the Constitution or laws of the United States, that is embraced by § 641 of the Revised Statutes. The right of removal given by that section exists only in the special cases mentioned in it. Gibson

v. Mississippi, 162 U. S. 566, 40 L. ed. 1075, 16 Sup. Ct. Rep. 904.

The Supreme Court has suggested that in cases when jurisdiction must be refused, it is well not to indicate any opinion as to the rights claimed, but leave that to the court which will act. This opinion, therefore, merely decides that Porto Rico has not state powers as to juries, but not what powers it has over the subject as a territory. This it is not necessary to determine because Revised Statutes, § 641, does not bring the matter here so that it can be determined.

An order will therefore be entered remanding and restoring the case to the District Court of Aguadilla.

It is so ordered.